IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
August 4, 2020 Session

## CHARLES HAMPTON v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
No. 10-04814      Lee V. Coffee, Judge

_____

**No. W2019-01372-CCA-R3-PC**

_____

The Petitioner, Charles Hampton, appeals the denial of post-conviction relief from his conviction for first degree premeditated murder, arguing (1) the post-conviction court erred in refusing to consider an expert's testimony, (2) trial counsel was ineffective in failing to seek the suppression of the Petitioner's statements to police, and (3) his mandatory life sentence as a juvenile offender is unconstitutional because it is the "functional equivalent" of life without parole.  After review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3, Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and J. ROSS DYER, J., joined.

Terita Hewlett, Memphis, Tennessee, for the Petitioner, Charles Hampton.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Leslie Byrd, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

After the victim, Anthony Jones, was fatally shot by members of his own gang on October 17, 2009, the Petitioner Charles Hampton, as well as Deanthony Perry and Kejuan Shields, were indicted by the Shelby County grand jury for first degree premeditated murder.  State v. Charles Hampton, No. 2012-02191-CCA-R3-CD, 2014 WL 2953410, at *1 (Tenn. Crim. App. June 27, 2014), perm. app denied (Tenn. Nov 19, 2014).  The Petitioner and Perry proceeded to a joint trial, where Shields testified as a witness for the State.  Id. at *1-2.

**Trial.** The evidence presented at trial established that the Petitioner, a juvenile, and three fellow gang members, namely Perry, Shields, and Jonathan Foulks, telephoned the victim, pretending to coordinate a marijuana purchase but actually arranging for the victim to be killed. Id. at *1-4. The Petitioner and these three men then drove to the victim's home and shot the victim several times when he exited his house to supply the drugs. Id. Officers found seventeen shell casings at the scene that had been fired from three different firearms. Id. at *3. The autopsy showed that the victim sustained eight gunshot wounds. Id. at *5. Although the Petitioner initially denied that he was involved in the victim's death, he later admitted to police that he was present when Shields shot the victim. Id. at *3. Perry also initially denied any involvement in the victim's death but later admitted to police that he was present when Shields shot the victim. Id. at *4. Neither the Petitioner nor Perry testified at trial. Id. at *5. Shields testified that he drove the men to the victim's home, where the Petitioner, Perry, and Foulks all fired shots at the victim. Id. at *2. At the conclusion of trial, the jury convicted the Petitioner and Perry of first degree premeditated murder, and they were sentenced to life imprisonment. Id. at *5.

The direct appeals filed by the Petitioner and Deanthony Perry were consolidated. See Charles Hampton, 2014 WL 2953410, at *1. The Petitioner argued that the trial court denied his right to compulsory process, that the trial court erred in limiting his cross-examination of a witness to explore his potential for bias, and that the evidence was insufficient to sustain his conviction. Id. at *6-12. This court affirmed the judgments of the trial court. Id. at *12. While the record shows that Deanthony Perry sought discretionary review, which the Tennessee Supreme Court denied on November 19, 2014, it does not appear that the Petitioner sought discretionary review.

**Post-Conviction Proceedings.** On or about June 5, 2015,[1] the Petitioner timely filed a pro se petition for post-conviction relief. The post-conviction court appointed counsel, who filed an amended petition. Thereafter, the Petitioner replaced appointed counsel with private counsel, who filed a second amended post-conviction petition, incorporating the previous post-conviction petitions and alleging that trial counsel coerced the Petitioner into rejecting an offer of twenty-five years; that trial counsel was ineffective in failing to have a mental evaluation performed on the Petitioner, in failing to seek a severance, in failing to suppress the Petitioner's statement to police, in failing to adequately investigate the case, in willfully and maliciously failing to preserve the Petitioner's file,

---

[1] The July 12, 2019 order denying relief states that the Petitioner filed his first post-conviction petition on "on or about June 5, 2015." Unfortunately, the "filed" stamp date on the copy of the petition in the technical record is indecipherable. In addition, item 22 of this petition, which states the date it was "given to prison authorities for mailing," was left blank. However, the Petitioner's verification page shows that he signed the petition and had it notarized on June 1, 2015. The State does not dispute the timeliness of this post-conviction petition.

and in evading discovery; and that the Petitioner's mandatory life sentence as a juvenile offender is unconstitutional.

At the post-conviction hearing, the Petitioner testified that although he was initially represented by another attorney, he decided to hire trial counsel after his bond was revoked. He said his case had already been set for trial by the time he hired trial counsel. He stated that he hired trial counsel in October or November 2011, and that although his trial was initially set for February, 2012, it was continued to July.

The Petitioner asserted that trial counsel visited him in jail approximately three times and that that they discussed his case, the discovery, and trial strategy. He said they also discussed the lesser-included offenses, although only within the context of the State's offer, which was for twenty-five years in exchange for his guilty plea to second degree murder. The Petitioner said trial counsel advised him to reject this offer because twenty-five years was the same sentence he would receive if convicted at trial, given that he was a juvenile offender and would not be convicted of first degree murder. The Petitioner maintained that trial counsel's advice regarding his potential sentence was the reason he rejected the offer and proceeded to trial. Although the Petitioner claimed that trial counsel should have allowed him to "sign for [his] twenty-five years," he admitted he never told the trial court he wanted to accept the State's offer.

The Petitioner acknowledged that his previous attorney had actually negotiated the twenty-five-year offer. He also acknowledged that the trial court told him that if he rejected the State's offer, his case would be set for trial on first degree murder charges, and he would face a life sentence. He explained that when his previous attorney first presented him with this offer, his mother told him to accept it, but his father was "iffy" about it, and the Petitioner ultimately rejected the offer because he could not decide what to do within the deadline of two court dates.

The Petitioner claimed that the offer of twenty-five years was still available when he hired trial counsel, even though he admitted that the trial court had already informed him that he would no longer be able to accept the plea offer. Although trial counsel told him he would not be convicted of first degree murder and would only face a maximum of a twenty-five-year sentence at trial, he was convicted of first degree premeditated murder and sentenced to a life sentence of sixty years. The Petitioner asserted that he had already served nearly ten years in prison, and he would not be released until July 7, 2068. At that point, the post-conviction court noted for the record that the Petitioner's offender sentence letter, which outlined the length of his sentence, also indicated that the court had informed the Petitioner prior to setting his case for trial, that "if he was convicted, [the court] would sentence him to life in prison, and life was construed to be sixty calendar years under

- 3 -

Tennessee law, and he could be released after serving fifty-one years of this sentence, based on his behavior, his credits, and other things that he did while [in] custody."

The Petitioner acknowledged that he gave two statements to police and that he identified some photographs of people he recognized from a photographic lineup. He stated that, at the time of the offense, he was seventeen years old and was enrolled in tenth grade for the second time. He said his previous attorney filed a motion to suppress his statements to police and claimed he was going to get his statements suppressed, but he never did.

The Petitioner said that when he talked to trial counsel about his statements to police, trial counsel told him he would have been in a better position if he had never made them. He said trial counsel never talked to him about setting his previous attorney's suppression motion for a hearing or about filing a different suppression motion.

The Petitioner said that he was aware that his codefendant Deanthony Perry had given a statement to police. However, he claimed that he and trial counsel only discussed the fact that codefendant Kejuan Shields was going to testify against him and never discussed Perry's statement. He also said that trial counsel never talked to him about his age and how it related to his state of mind, although he admitted he had never been diagnosed with any mental issues and was not currently taking any medication.

The Petitioner stated that he was at his mother's house when the police arrived and said they needed to talk to him about a homicide. He claimed he told the police that he wanted his mother to go with him, but the officers said that they were just going to question him for a few minutes and then bring him back. The Petitioner asserted that the officers got to his home around noon or 1:00 p.m. and that he arrived at the station around 1:00 or 2:00 p.m. He also claimed that the police did not take him to the juvenile facility until around 9:00 or 10:00 p.m. that night and that he did not go before the juvenile court judge until two weeks later. The Petitioner said he was surprised that his arrest ticket showed that he was arrested at 3:26 p.m. and arrived at the police station at 3:55 p.m. However, he acknowledged that this incident had occurred several years earlier and that he was testifying based on his memory of these events.

The Petitioner asserted that the officers handcuffed him at his home and placed him in the backseat of a patrol car. Although he was in handcuffs, he believed that he would be free to leave after he answered the officers' questions. He said he did not realize he was under arrest until he finished answering the officers' questions at the police station and they informed him that he could not go home.

The Petitioner said that once he arrived at the police station, the officers handcuffed him to a table, and Major Goods and Sergeant Lundy began talking to him "immediately" without either of his parents being in the room and without ever advising him of his rights. The Petitioner said Major Goods asked him if he knew who the victim was, and he said that he did. Then Sergeant Lundy told him they had heard he was involved in the victim's death, and the Petitioner replied that he was not involved, although he had heard what happened to the victim. Major Goods then asked him when was the last time he had seen the victim, and the Petitioner responded that he had seen the victim when he was walking to school. At that point, Major Goods and Sergeant Lundy asked him how old he was, and when he replied that he was seventeen years old, they stopped his interview. The Petitioner said that he then fell asleep in the interview room for a couple of hours, and when he awoke, his father was present. The officers entered the interview room with his father, and when his father asked what was going on, the Petitioner told him that they were asking him questions about the victim's death. The officers then asked the Petitioner if he would give a statement, and the Petitioner agreed to do so.

The Petitioner stated that he did not see the officers completing the information on his advice of rights form regarding his age and his school. He acknowledged that Sergeant Lundy read him his rights but claimed this did not mean anything because officers had already talked to him before they informed him of his rights. The Petitioner asserted that if he had known he could remain silent and get an attorney, he would never have said anything to the police. However, he acknowledged that the advice of rights form explained that he had a right to remain silent, that anything he said could be used against him in a court of law, that he had a right to an attorney, and that he had the right to talk to an attorney before answering any questions. He said he acknowledged his understanding of these rights by writing, "Yes," on the form before he and his father signed the advice of rights form.

The Petitioner admitted that he did not have any trouble reading the advice of rights form. However, he stated that he did not understand his rights and that he had never been in jail at the time of his interview. He said he believed the officers just wanted to talk to him about what he knew about the victim's death. He also claimed that he did not sign the advice of rights form until after he gave his statement. The Petitioner said that when the officers told him he had the right to an attorney, he did not understand what that meant and claimed that the first time he learned about his rights was when other inmates explained them to him. The Petitioner asserted that if he had known he could stop the interview, he never would have provided a statement to the police. He claimed that prior to his interview in this case, he had never made a statement to police, had never been questioned by detectives or police officers, and had never had his parents present to explain his rights to him.

The Petitioner said that when he gave his first statement, the police asked him questions, and a lady typed everything he said. The Petitioner acknowledged that in his first statement, he denied any involvement in the victim's death, which was not the truth. At the end of his statement, when the detectives asked him if there was anything else he wanted to say, the Petitioner replied, "I'm innocent." He acknowledged that after answering the questions, he read over his statement and then he and his father signed his written statement. The Petitioner said that the police officers never told him he was under arrest and never explained what they meant when they said he could be charged. He claimed he did not know that what he said could be used against him and believed that any statements he gave would be used to help the police solve the case.

The Petitioner said that after giving his first statement, the officers took his father into the hallway for approximately fifteen minutes, and when they all returned, his father told him the police already had proof that he was at the crime scene and that he had told someone that he shot the victim. His father then told him he needed to tell the police that he was present at the scene so that the officers could help him. Major Goods also informed him that they were "trying to help [him] out" but that they already knew more than the Petitioner had told them. At that point, the Petitioner decided to give his second statement, wherein he admitted that he was present and unarmed when Kejuan Shields shot the victim. He also said that his phone had been used to contact the victim and that he had been in the car when the shooting actually took place, which was the truth. The Petitioner said he believed that he could just talk to the detectives and then go home. He claimed that no one ever told him he would not be free to go home after giving his statements.

The Petitioner asserted that trial counsel should have kept his statements out of the trial because the fact that he provided two different statements made him look like he was lying. However, the Petitioner acknowledged that he did not admit to shooting the victim in either of his statements and that both he and codefendant Perry asserted in their statements that codefendant Shields was the person who shot and killed the victim. Nevertheless, the Petitioner said that Perry's statement to police indicated that there had been a plan and a discussion at the Petitioner's house about dealing with the victim, that the Petitioner and the other three men got in the car together to look for the victim, and that they made a call to the victim. He also said that he and Perry mentioned in their statements that they all belonged to the same gang. The Petitioner acknowledged that he and trial counsel decided he would not testify because he would likely be impeached. He also admitted that if trial counsel had believed it was in his best interest to have the suppression motion heard, he would have asked the court for a hearing on it.

The Petitioner said that prior to this case, he had never been questioned by police, had never had his parents explain his rights to him, had never given a statement to police, and had never been in jail. The Petitioner admitted that he had thirteen prior contacts with

the juvenile court system before this incident but claimed they all had to do with fighting at school.  The post-conviction court noted however that the Petitioner's juvenile record actually consisted of "eleven charges" including theft of property, assault, assaulting a police officer, possession of a controlled substance, disorderly conduct, possession of marijuana with intent to sell, aggravated criminal trespass, and inciting a riot.  It then stated, "I am finding that as a matter of fact, that [the Petitioner] has not been honest with the Court when he told the Court he had basically no contact with police and courts, and that he'd never been through anything like this before.  He's been charged with offenses that would have been felony offenses had they been committed as an adult."

Trial counsel testified that he had worked in trial litigation from 2000 through 2016, had handled sixty-seven homicide cases, and had tried at least three capital cases prior to handling the Petitioner's case.  He said that the Petitioner's father, Charles Cole, initially talked to him about representing the Petitioner and that he visited the Petitioner in jail before the Petitioner's family actually retained him.  Trial counsel stated that the Petitioner's case had already been set for trial at the time he was retained.  At the beginning of the representation, trial counsel conversed with the Petitioner, who "was a child, as far as [he] was concerned."  He said he wanted to determine whether the Petitioner was "a leader" or "a follower" and wanted to ensure that the Petitioner knew he was facing a life sentence.  Trial counsel said that the Petitioner "clearly understood what was going on[.]"

Trial counsel asserted that the twenty-five-year offer had been received before he was retained.  He explained that this offer was tied to a joint agreement with codefendant Deanthony Perry, and that although Perry had wanted to enter a guilty plea, the Petitioner had rejected the offer and "dragg[ed]" Perry into trial.  He said that the Petitioner's family initially retained him because they believed the Petitioner's previous attorney was pressuring the Petitioner to accept the State's offer.  Trial counsel asserted that the twenty-five-year offer was no longer available when he began representing the Petitioner.  By that time, codefendant Kejuan Shields had made a deal with the State to testify against Petitioner and "all deals were off the table," a development that he discussed with the Petitioner and his father "[a]t length."

Trial counsel asserted that there was "no way" he would have told the Petitioner, who was charged with first degree premeditated murder, that he was only facing a maximum of twenty-five years at trial.  He said the proof placed the Petitioner at the scene, and because of the law on criminal responsibility, the case depended on whether the Petitioner knew Shields was going to kill the victim.  At trial, he presented the jury with crime scene diagrams in an attempt to prove that the Petitioner was not the shooter and that the shots had been fired by Shields, and those diagrams were corroborated by Perry's statement to police.  He also presented evidence supporting lesser-included offenses but refrained from specifically arguing that the jury should convict the Petitioner of a specific

lesser-included offense because that would have meant acknowledging that the Petitioner was guilty of a criminal offense.

Trial counsel acknowledged that he never filed a motion to suppress the Petitioner's statements to police and never pursued the suppression motion filed by Petitioner's previous attorney. He noted that "sometimes defense lawyers just file them as a matter of course and figure out later if there is any merit to it." Trial counsel said he talked to the Petitioner and his father about the Petitioner's two statements to police, about the fact that prior counsel had filed a motion to suppress, and about whether there was any basis for suppression of his statements. Trial counsel noted that even if the Petitioner's statements had been suppressed, Kejuan Shields and witnesses at the scene were going to testify that the Petitioner was present when the victim was killed. Trial counsel acknowledged telling the Petitioner he was "foolish for making those statements." He said a fourth person in the vehicle, who never gave a statement to police, was in the same position as the Petitioner and was never charged. He said the Petitioner "almost regretted the fact that his father had convinced him to talk to the police."

Trial counsel knew that there would be a "negative spin" at trial on the Petitioner's statements to police. He said they had to choose whether to have the Petitioner testify or allow the statements to speak for him and that they ultimately decided it was better to use the statements rather than have the Petitioner testify and be cross-examined by experienced gang prosecutors. Trial counsel said that he knew codefendant Shields was going to testify that the Petitioner shot the victim but that the Petitioner's own statements denied that the Petitioner fired a gun and other proof supported this claim that the Petitioner never fired a shot. He said that if the Petitioner had testified he was not present at the scene, the State would have impeached him with his statements to police.

Trial counsel said codefendant Perry had made a statement to police, wherein he said that they all met at the Petitioner's house, concluded that something had to be done about the victim, got in a car to look for the victim, and went to the victim's home under the guise of buying marijuana but actually intended to kill the victim. Trial counsel said that several other witnesses would have testified to those facts and that Perry's statement did not implicate the Petitioner more than the Petitioner's own statements. Trial counsel said that Perry's statement was helpful to the Petitioner's case because it corroborated the Petitioner's claim that codefendant Shields was the shooter.

Charles Cole, the Petitioner's father, testified he hired trial counsel after the Petitioner's previous attorney insinuated that they did not have the funds to pay a bond for the Petitioner. He said that they received the twenty-five-year offer while represented by the first attorney but was unsure if the offer was still available when trial counsel took over the Petitioner's case. Although he had wanted the Petitioner to accept the twenty-five-year

offer, the Petitioner was "bullheaded" and likely believed that twenty-five years seemed like the rest of his life.

Cole said he was present for and signed both of the Petitioner's statements to police. He stated that he first received a call from Major Goods at 6:30 p.m., asking him to come to the station because officers had some questions about the Petitioner's involvement in a homicide. Upon receiving this call, Cole drove directly to the police station, arriving there around 7:00 p.m. When Cole got there, Sergeant Lundy informed him that the officers had stopped questioning the Petitioner when they discovered that the Petitioner was seventeen years old. Cole did not know how long the Petitioner had been questioned before the officers discovered the Petitioner's age. Cole was taken into a room where the Petitioner was handcuffed to a table. He noted that the Petitioner's mouth was "all white and dry looking." The detectives asked him if it would be okay to ask the Petitioner a few questions, and then the Petitioner "began answering their questions, and . . . [Cole] signed off on something, and [the Petitioner] signed off on something."

Cole identified the advice of rights form and acknowledged that he and the Petitioner had signed it. He agreed that this form stated that the Petitioner had the right to an attorney and the right to remain silent, and he admitted that the police read this form to him and the Petitioner. Cole said that although the Petitioner was "hesitant" about signing the advice of rights form, he never talked to the Petitioner about whether they should sign this form. He admitted that he never asked the detectives to stop questioning the Petitioner and that he believed it would be helpful for the Petitioner to tell the officers who was the shooter.

Cole said that after the Petitioner gave his first statement, Major Goods asked Cole to step out of the room and showed him some information about the Petitioner's involvement in the shooting. Cole said the detectives also informed him that the Petitioner would be charged with first degree murder. After talking to Major Goods for more than an hour, Cole began to get "scared." When he asked Sergeant Lundy if he would hire a lawyer if it were his son, Sergeant Lundy replied that he "would just want him to tell the truth." Upon hearing this, Cole went back into the interview room and told the Petitioner, "You got to tell them something." Cole admitted, "So, I may have forced him to make a second statement. I'm not sure." He said that the officers never informed him that the Petitioner was under arrest at the time the Petitioner provided his statements. He also believed that the Petitioner would be able to go home once he told the officers that he did not shoot the victim.

Cole said that he could not imagine the Petitioner being involved in a homicide and hoped the Petitioner would say something that would exonerate him so he would not be charged. He asserted that the detectives became more verbally aggressive with the

Petitioner during his second statement, when the Petitioner admitted that Shields was the shooter and that he had stayed in the car at the time of the offense. Once the Petitioner disclosed that he was present at the scene, the officers informed the Petitioner that he was under arrest for murder. Cole said he was aware now, after hearing the proof at the Petitioner's trial, that the officers knew, prior to the Petitioner giving his second statement, that other individuals had placed the Petitioner at the scene. Cole stated that he left the police station between 10:00 p.m. and 11:00 p.m. that night.

Cole said he believed the Petitioner's first statement was voluntary but that he "pushed" the Petitioner to give the second statement. He acknowledged that the detectives did not force the Petitioner to give his second statement. Cole said he felt it was his fault that the Petitioner gave his second statement because the Petitioner had been "firm" with the officers when he first arrived, even though they were doing their "good-cop-bad-cop thing." Cole acknowledged that neither he nor the Petitioner told the officers to stop asking questions or informed the officers that they wanted a lawyer.

Major Darren Goods, an investigator in the Homicide Bureau of the Memphis Police Department, testified that he was the case coordinator in the victim's case and took statements from the Petitioner and his codefendant, Deanthony Perry. Major Goods said the Petitioner was under arrest when the patrol officers put handcuffs on him before bringing him to the police station. He noted that the Petitioner arrived at the station in the early evening, around 3:55 p.m. By the time he arrived at the station, the Petitioner was already under arrest, was in handcuffs, and had his ankle shackled to the bench upon which he was sitting. Major Goods did not recall whether anyone told the Petitioner that he was under arrest until officers read his advice of rights form to him.

Major Goods said that he and the other officers were aware that the Petitioner was a juvenile. He said that the patrol officers who arrested the Petitioner at his home also would have known that the Petitioner was a juvenile. Major Goods explained that the Petitioner was not taken to the juvenile facility to be processed because the police had probable cause to arrest him and wanted to interview him about his involvement in the victim's death, which was common practice in cases involving juveniles where the investigation is continuing.

Major Goods said that they contacted Charles Cole, the Petitioner's father, shortly after the Petitioner arrived at the station and that it took approximately an hour or longer for Cole to arrive. He explained that they contacted the Petitioner's father, rather than the Petitioner's mother, because the Petitioner had given them his father's telephone number. He said that if there had been a parent present at the home at the time of the Petitioner's arrest, the patrol officers would have asked that parent to accompany them when the took the Petitioner to the police station. Major Goods stated that Cole arrived at the station at

- 10 -

6:30 p.m. He and the officers informed Cole that the Petitioner was under arrest for the murder of the victim and began asking the Petitioner for some biographical information at 6:45 p.m. They presented the initial advice of rights form to the Petitioner at 6:55 p.m., and they had finished taking the Petitioner's second statement by 10:12 p.m. Major Goods said that the department follows the same interview protocols for juveniles as adults, with the exception that they want to have a parent's or guardian's permission to interview a juvenile.

Major Goods asserted that he and the other officers did not talk to the Petitioner before Cole arrived, except to ask the Petitioner if he was hungry or needed to use the bathroom. He also said they never asked Cole to leave so that they could talk to the Petitioner alone. He noted that Sergeant Kevin Lundy and Sergeant Monday Quinn completed the Petitioner's initial advice of rights but that Sergeant Quinn had to step out, and he came in and was present for both of the Petitioner's statements.

Major Goods stated that both the Petitioner and his father acknowledged that they could read and that they understood the Petitioner's rights, and both agreed to allow the Petitioner to talk to the officers. He said there was no indication that the Petitioner or Cole had "cognition issues" or that they did not understand the rights. He added that if there had been any question about the Petitioner's ability to read or if there had been any indication that the Petitioner had cognitive difficulties, he would have noted it on his supplement and would have taken precautions while taking the Petitioner's statement.

Major Goods said he provided the Petitioner with an advice of rights a second time and informed the Petitioner that he was under arrest and might be charged before he took the Petitioner's first statement. Before giving his first statement, the Petitioner acknowledged that he understood his rights and wanted to give a statement. After the Petitioner provided his first statement, he asked if there was anything he would like to add, and the Petitioner stated, "I am innocent." Then both the Petitioner and the Petitioner's father signed the Petitioner's first statement. Major Goods said he and the other officers knew that the Petitioner's first statement was not true based on proof they already obtained. Specifically, he said the officers already knew that the Petitioner's cell phone had been used in connection with the victim's death, and they had information that placed the Petitioner at the crime scene.

Major Goods stated that after the Petitioner gave his first statement, Cole asked what would happen next, and when he replied that the Petitioner would be charged with first degree murder, Cole asked to speak to the Petitioner alone. After doing so, Cole talked with the officers before going back to speak with the Petitioner a second time. Then, Cole informed the officers that the Petitioner wanted to add some things to his statement. At that point, Major Goods again told the Petitioner that he was under arrest and might be

- 11 -

charged before taking the Petitioner's second statement. The Petitioner, in his second statement, admitted he was at the crime scene but denied shooting the victim. Major Goods said that the Petitioner finished with his second statement at 10:08 p.m. and that the Petitioner and Cole signed this statement at 10:12 p.m. After the Petitioner made his statements, a patrol officer transported the Petitioner to juvenile court, where he was charged and the arrest ticket completed. Major Goods stated that he never asked the Petitioner to give a second statement. He stated that it was merely an oversight that he did not sign the Petitioner's first and second statements.

Major Goods acknowledged telling the Petitioner that he would be helping himself if he helped the police with their investigation. He said he never threatened the Petitioner or Cole in order to get the Petitioner's statement and never made any promises to them about charges in exchange for the Petitioner providing a statement. He asserted that he never told the Petitioner he would be allowed to go home.

Sergeant Kevin Lundy testified that when he and the other officers realized the Petitioner was a juvenile, the Petitioner's father, Charles Cole, was contacted. He confirmed that Cole was present when the Petitioner was interviewed. Sergeant Lundy said the department always tried to have a parent or guardian present when interviewing a juvenile, and he denied having any conversations with the Petitioner outside of Cole's presence.

Sergeant Lundy said that he had the Petitioner and Cole read the advice of rights form aloud and then asked the Petitioner some general background questions. The Petitioner responded that he understood the rights delineated on the advice of rights form and that he wanted provide a statement. Then, the Petitioner and Cole signed the bottom of the advice of rights form. Sergeant Lundy noted that he also signed the advice of rights form and that Sergeant Quinn completed the biographical information at the top of the form.

Sergeant Lundy said that Cole had no questions or concerns about the advice of rights form and that both the Petitioner and Cole acknowledged that they had read and understood the advice of rights form. He denied making any threats or promises to the Petitioner or Cole in order to obtain the Petitioner's statements.

Sergeant Lundy said that although he was present for both of the Petitioner's statements, Major Goods was the case officer and likely asked the questions of the Petitioner. He also said that Major Goods completed the case supplement.

Sergeant Lundy stated that after the Petitioner provided his first statement, Major Goods told Cole that the Petitioner would be charged with first degree murder. He said

- 12 -

Cole asked to speak to the Petitioner, and approximately thirty minutes later, Cole told the detectives that the Petitioner wanted to add something to his statement. Thereafter, the Petitioner provided his second statement.

During the evidentiary hearing, Petitioner's post-conviction counsel asked the court if she could present testimony from Dr. Sidney Ornduff, or at the very least, make an offer of proof regarding Dr. Ornduff's testimony, even though she knew the State would be objecting to this testimony. Counsel said Dr. Ornduff had reviewed the Petitioner's "juvenile record, including his psychological screening from juvenile court," and would testify that "the mind of a juvenile at seventeen years old is different than the person that you saw in the hearing today, who is now . . . twenty-six years old." She also stated that Dr. Ornduff's testimony would be relevant to "what the Court needs to consider" in a "motion to suppress." In response to questioning from the post-conviction court, counsel acknowledged that Dr. Ornduff had never interviewed the Petitioner and had only "looked at his records. The post-conviction court, after hearing from the State on this issue, held that Dr. Ornduff's testimony was irrelevant and inadmissible because she could only testify about "general personality traits" and could not testify about the Petitioner specifically. The court also noted that because the issues regarding whether the Petitioner knowingly waived his <u>Miranda</u> rights or voluntarily gave his statements were not raised on direct appeal, they were waived. Nevertheless, the court allowed the Petitioner to make an offer of proof of Dr. Ornduff's testimony "for the purposes of appellate review . . . only."

During this offer of proof, Dr. Ornduff, an expert in clinical psychology, testified that she was the director of clinical services at the juvenile court from 2009 to 2014, and that although this was during the time that the Petitioner's case was pending, she was not the psychologist who evaluated the Petitioner. Dr. Ornduff stated that she reviewed the Petitioner's "scant" juvenile court "transfer packet," which included information about the Petitioner's charge, the outcome of his transfer hearing, notable things about the Petitioner's stay in juvenile detention, his history with the court, his arrest ticket, and the psychological report on the Petitioner conducted by Dr. Joanie Bailey. She said she prepared a report summarizing cases decided by the United States Supreme Court showing why it was important to treat juveniles differently than adults. Although the post-conviction court accepted Dr. Ornduff's report for identification purposes, it found that this report was "not relevant to any issues that are before [it] in the post-conviction hearing at all, because the Tennessee Supreme Court and the United States Supreme Court have actually decided that even life without the possibility of parole is a lawful sentence in some cases, as long as there [are] some . . . sentencing factors and findings that a trial court . . . make[s]."

Dr. Ornduff admitted that she had not performed any testing in this case and had not talked to the Petitioner, the Petitioner's family, Petitioner's trial counsel, or the police

- 13 -

officers who interviewed the Petitioner. She said she did not receive any raw data, comments, or notes from the Petitioner's psychological assessment. In addition, she did not review the Petitioner's school records or family services records and did not review the full records from the Youth Services Bureau.

Dr. Ornduff stated her belief that the Petitioner, at age twenty-seven, was more mature than he was at the age of seventeen, although she acknowledged that the Petitioner's intelligence was unlikely to have changed. She acknowledged that there probably was "little difference" in the Petitioner's cognitive understanding between now and when he gave his police statements. However, she stated that there were substantial differences between the mind of a juvenile and the mind of an adult that would change the way people comport themselves, respond to authority, and behave in terms of being more or less impulsive or making better or worse decisions. She noted that the Petitioner was much more likely at seventeen to comply with the requests of his peers. She also noted that juveniles who are in "high pressure situations," like interrogations for murder, were "much less able to form independent, clear decisions about asking for an attorney, asking for a break, or taking the time to think about an answer before responding. She asserted that although the Petitioner had the cognitive ability to understand, she believed the Petitioner lacked "psychosocial maturity," which was demonstrated by things like "emotionality, impulsivity," and "poor decision-making."

Dr. Ornduff asserted that the psychological assessment she reviewed indicated that the Petitioner had an IQ of 82, which was in the "low average range," that there was nothing remarkable in the assessment of the Petitioner's personality features, and that the Petitioner scored in the "very high range" with regard to traumatic experiences, although these traumatic experiences were not detailed in the report she reviewed. She admitted that the Petitioner's IQ score put him outside the range of intellectual disability. She acknowledged that she had not diagnosed the Petitioner with a mental illness, disability, or disorder and that the report from the juvenile court showed that there were no indications that the Petitioner had a thought disorder. She also acknowledged that the Petitioner had not been found to have any mental disorders or defects and did not have any sort of intellectual disability when he was assessed by juvenile court.

Dr. Ornduff said she was aware that the Petitioner was an admitted gang member and that this case involved other gang members. However, she said she did not know anything about the Petitioner's place in the gang hierarchy or about whether the crime against the victim had to do with the victim's non-compliance with gang orders. She admitted that the Petitioner's compliance with his peers could also be explained by the Petitioner's gang membership. She stated that because the Petitioner's juvenile offenses had been handled non-judicially or through the Youth Services Bureau, she questioned whether these juvenile offenses would have given the Petitioner a level of sophistication

with the judicial system. She was not aware that the Petitioner had given two different statements to police or that the police had waited for the Petitioner's father to arrive before questioning the Petitioner. However, she was aware that although the Petitioner initially said that he was not involved, his statement evolved, and the Petitioner later admitted that he was present at the crime scene.

Dr. Ornduff stated that juveniles had general personality traits that could prevent them from understanding certain things or could prevent them from being aware of the consequences of their actions during an interrogation. However, she acknowledged that she could not say if this was true for the Petitioner in this case.

Following this hearing, the post-conviction court denied relief in a lengthy order entered on July 12, 2019. In it, the court specifically found that the Petitioner's testimony that he had been "untruthful when he indicated that he understood his rights and wanted to waive his rights and make a statement [to police] in this case" was incredible. The court also provided the following findings regarding Dr. Sydney Ornduff's testimony:

> Dr. Sydney Ornduff testified that she never interviewed or evaluated the Petitioner. Dr. Ornduff provided general statements regarding juveniles and problems in forming clear decisions. Admitting that she had not examined all of the Petitioner's records, Dr. Ornduff did not provide any testimony regarding the Petitioner's ability to understand and waive his Miranda rights. Dr. Ornduff admitted that she believes that the Petitioner did have the cognitive ability to understand and waive his rights. Dr. Ornduff expressed some concerns about the constitutionality of a life sentence for a juvenile offender.

The post-conviction court then held that all the issues raised in the post-conviction petition had been waived or previously determined and that it was precluded from analyzing the issues under the plain error doctrine. Nevertheless, with regard to the Petitioner's claim that trial counsel was ineffective in failing to seek the suppression of his statements to police, the post-conviction court made the following findings of fact and conclusions of law:

> [Trial counsel] had no basis to file a motion to suppress a voluntary statement given by the Petitioner after the Petitioner and his father had signed a waiver of rights. Any actions of [the Petitioner's father] Mr. Cole are not attributable to law enforcement—as Mr. Cole was not an agent of the State and was not acting as an agent of the State. This issue has no merit.
>
> . . . .

- 15 -

Trial counsel made a well-founded strategic choice to not file frivolous suppression and severance motions in this case. This issue is without merit as the Petitioner has wholly failed to prove deficiency or prejudice. The Petitioner has failed to present any proof or theories as to how such motions would have been successful. [Trial counsel] made a tactical and ethical decision not to file frivolous motions in this case.

Lastly, with regard to the Petitioner's claim that his mandatory life sentence is unconstitutional, the post-conviction court made the following findings and conclusions:

Relying on Miller v. Alabama, 132 S. Ct. 2455 (2012), the [P]etitioner requests that his life sentence be reduced to reflect a new sentence structure that is consistent with the principles of Miller. The Petitioner avers that he was 17 years old at the time of the commission of these offenses. The Petitioner['s] reliance on Miller is misplaced.

. . . .

This Petitioner was sentenced to life in prison with the possibility of parole as permitted by Tennessee law. This request is unfounded and unsupported by State or Federal law.

The Petitioner is essentially complaining about the sufficiency and the weight of the convicting evidence. This issue has clearly been resolved against the Petitioner.

. . . .

Clearly, the precise issue of sufficiency of the evidence and the credibility of witnesses about which the Petitioner now complains was previously determined and rejected on direct appeal. This issue cannot be revisited in this post-conviction proceeding. Miller v. State, 54 S.W.3d 743 (Tenn. 2001). A ground for relief [i]s considered previously determined "if a court of competent jurisdiction had ruled on the merits after a full and fair hearing." House v. State, 911 S.W.2d 705 (Tenn. 1995). This issue has been previously determined against the Petitioner, is without merit, and cannot be addressed in a post-conviction hearing.

After the court entered its order denying post-conviction relief, the Petitioner timely filed a notice of appeal.

- 16 -

## ANALYSIS

**I. Refusal to Consider Expert's Testimony.** The Petitioner contends that the post-conviction court's refusal to consider Dr. Sidney Ornduff's testimony resulted in the court erroneously crediting the Petitioner's statements to police and erroneously discrediting the Petitioner's post-conviction testimony that he did not knowingly waive his rights before giving his statements. The Petitioner asserts that the proof considered by the post-conviction court was given by the Petitioner when he was a juvenile, while the proof rejected was given by the Petitioner as an adult, and "[t]he dichotomy between the two becomes apparent when Dr. Ornduff's testimony is taken into consideration." The Petitioner also claims that the post-conviction court, in excluding Dr. Ornduff's testimony, erroneously relied on State v. Hall, 958 S.W.2d 679 (Tenn. 1997), which governs the admissibility of expert testimony about a defendant's incapacity to form the requisite culpable mental state. Id. at 691 ("While evidence that a particular defendant, because of a mental disease or defect, lacks the capacity to form the requisite intent is admissible in Tennessee, expert opinion testimony about the typical reactions of certain personality types is not relevant to the capacity of the particular defendant on trial."). He argues that Hall was an inappropriate basis to reject Dr. Ornduff's testimony, which not only corroborated the Petitioner's testimony that he did not understand his rights or the repercussions of giving a statement but also explained why the Petitioner so easily surrendered to pressure by officers and his father to give a statement and why the Petitioner ultimately rejected the plea deal.

The State responds that the post-conviction court appropriately determined that Dr. Ornduff's testimony was irrelevant to the issues in the Petitioner's case because she never examined the Petitioner, reviewed only a few of his records, was unfamiliar with some of the most basic details of his case, and acknowledged that her opinion was based on general personality traits rather than anything specific to the Petitioner. The State asserts that even if the post-conviction court had accepted Dr. Ornduff's testimony, nothing in her testimony would have made the Petitioner's testimony at the post-conviction hearing more credible. We conclude that the post-conviction court did not err in refusing to consider Dr. Ornduff's testimony.

During the evidentiary hearing, the post-conviction court determined that Dr. Ornduff's testimony was irrelevant and inadmissible because she could only testify about "general personality traits" and could not testify about the Petitioner specifically; however, the court allowed the Petitioner to make an offer of proof of Dr. Ornduff's testimony "for the purposes of appellate review . . . only." During the offer of proof, Dr. Ornduff testified that juveniles had general personality traits that could prevent them from understanding certain things or prevent them from knowing the consequences of their actions during an

interrogation; however, she admitted that she was unable to testify that this was true for the Petitioner in this case.

At the conclusion of the offer of proof, the post-conviction court reiterated its belief that Dr. Ornduff's testimony was irrelevant and inadmissible because she failed to testify that "these sociological and psychological traits or characteristics" affected the Petitioner's ability to understand his Miranda rights or to provide a voluntary statement to police. In its order denying relief, the post-conviction court asserted that Dr. Ornduff had never interviewed or evaluated the Petitioner, had provided only general statements regarding juveniles' problems making clear decisions, and had been unable to provide any testimony regarding the Petitioner's ability to understand and waive his Miranda rights. The post-conviction court also highlighted Dr. Ornduff's admission that she believed the Petitioner had the cognitive ability to understand and waive his rights.

Initially, we note that the Petitioner has waived any issues as to whether he knowingly waived his Miranda rights or voluntarily provided his statements to police as a juvenile because he failed to raise these issues at trial or on direct appeal. See Tenn. Code Ann. §§ 40-30-106(g), 40-30-110(f); see also Tenn. Sup. Ct. R. 28, § 2(D) ("A ground for relief is waived if the petitioner or petitioner's counsel failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented."). However, we can consider whether the post-conviction court abused its discretion in refusing to consider Dr. Ornduff's testimony when determining whether trial counsel was ineffective in failing to seek suppression of the Petitioner's statements to police.

Determinations regarding the qualifications, admissibility, relevance, and competence of expert testimony fall within the broad discretion of the trial court and will be overturned only for an abuse of that discretion. State v. Davidson, 509 S.W.3d 156, 208 (Tenn. 2016) (citing McDaniel v. CSX Transp., Inc., 955 S.W.2d 257, 263-64 (Tenn. 1997); State v. Scott, 275 S.W.3d 395, 404 (Tenn. 2009)). "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." Scott, 275 S.W.3d at 404-05 (citing Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth., 249 S.W.3d 346, 358 (Tenn. 2008)).

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue

- 18 -

delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Unfair prejudice has been defined as "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily an emotional one.'" State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978) (quoting Fed. R. Evid. 403, Advisory Comm. Notes).

In addition, Rule 702 of the Tennessee Rules of Evidence, which governs the admissibility of expert testimony, provides: "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702 (emphasis added). However, the court is free to disallow an expert's testimony "in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness." Tenn. R. Evid. 703.

Here, the post-conviction court held that Dr. Ornduff's testimony was irrelevant and inadmissible because she could only testify about "general personality traits" and could not testify about the Petitioner specifically. Although Dr. Ornduff's testimony was offered to suggest that the Petitioner lacked the ability to understand and waive his Miranda rights or provide a voluntary statement, rather than to show that the Petitioner lacked the capacity to form the required mental state for the offense pursuant to Hall, we conclude that the post-conviction court did not abuse its discretion in excluding Dr. Ornduff's testimony. Because Dr. Ornduff was unable to testify that "sociological and psychological traits or characteristics" affected the Petitioner's ability to understand his rights or provide a voluntary statement to police, her testimony was irrelevant and failed to substantially assist the post-conviction court in understanding the evidence or determining a fact in issue at the hearing. Accordingly, we conclude that the post-conviction court acted well within its discretion in refusing to consider it. While the Petitioner offered Dr. Ornduff's testimony in an attempt to buttress his claim that trial counsel was ineffective in failing to seek suppression of his statements, we conclude that, for the reasons explained in the next section, trial counsel did not provide ineffective assistance. Consequently, the Petitioner is not entitled to relief on this issue.

**II. Trial Counsel's Failure to Suppress Statements.** The Petitioner also argues that trial counsel was ineffective in failing to seek suppression of his two statements to police. He claims that he spent "up to eight and one-half hours" at the police station, shackled to a table, where he was interrogated and pressured by the police and his father before giving two inculpatory statements. He also asserts that at the time he gave these statements, he was seventeen years old and in tenth grade for the second time, had no previous experience with the court system, had never previously been advised of his Miranda rights, had never given a formal statement, and had a low I.Q. of 82. The Petitioner suggests that these circumstances demonstrate trial counsel's deficiency in

failing to seek suppression of his statements. The Petitioner also asserts that had trial counsel filed a motion to suppress his statements, this motion would have been granted and would have "radically altered" his defense, thereby establishing the prejudice prong of Strickland. See Kimmelman v. Morrison, 477 U.S. 365, 375 (1986). The State responds that because trial counsel made a strategic decision to use the Petitioner's statements at trial, he did not provide ineffective assistance of counsel. We conclude that trial counsel was not ineffective.

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction or sentence is void or voidable because of an abridgement of a constitutional right. Tenn. Code Ann. § 40-30-103. A post-conviction petitioner has the burden of proving the factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); see Tenn. Sup. Ct. R. 28, § 8(D)(1); Nesbit v. State, 452 S.W.3d 779, 786 (Tenn. 2014). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Lane v. State, 316 S.W.3d 555, 562 (Tenn. 2010); Grindstaff v. State, 297 S.W.3d 208, 216 (Tenn. 2009); Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

This court reviews "a post-conviction court's conclusions of law, decisions involving mixed questions of law and fact, and its application of law to its factual findings de novo without a presumption of correctness." Whitehead v. State, 402 S.W.3d 615, 621 (Tenn. 2013) (citing Felts v. State, 354 S.W.3d 266, 276 (Tenn. 2011); Calvert v. State, 342 S.W.3d 477, 485 (Tenn. 2011)). However, a post-conviction court's findings of fact are conclusive on appeal unless the evidence in the record preponderates against them. Tenn. R. App. P. 13(d); Calvert, 342 S.W.3d at 485 (citing Grindstaff, 297 S.W.3d at 216; State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999)). "Accordingly, appellate courts are not free to re-weigh or re-evaluate the evidence, nor are they free to substitute their own inferences for those drawn by the post-conviction court." Whitehead, 402 S.W.3d at 621 (citing State v. Honeycutt, 54 S.W.3d 762, 766 (Tenn. 2001)). "As a general matter, appellate courts must defer to a post-conviction court's findings with regard to witness credibility, the weight and value of witness testimony, and the resolution of factual issues presented by the evidence." Id. (citing Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999)).

The right to effective assistance of counsel is protected by the United States Constitution and the Tennessee Constitution. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996); Strickland v. Washington, 466 U.S. 668, 687 (1984). A petitioner successfully demonstrates deficient performance when the petitioner establishes that his attorney's conduct fell "below an objective standard of reasonableness under prevailing professional norms." Goad, 938

S.W.2d at 369 (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). Prejudice arising therefrom is demonstrated once the petitioner establishes "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. at 370 (quoting Strickland, 466 U.S. at 694). "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Id.

In evaluating an attorney's performance, we "must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462 (citing Strickland, 466 U.S. at 689). In addition, we must avoid the "distorting effects of hindsight" and must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Strickland, 466 U.S. 689-90. Moreover, "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." Id. at 688-89. However, "'deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (quoting Goad, 938 S.W.2d at 369).

At the post-conviction hearing, Major Goods, Sergeant Lundy, and Charles Cole, the Petitioner's father, all testified that the Petitioner and his father were advised of the Petitioner's Miranda rights, acknowledged that they understood these rights, and signed the advice of rights form before the Petitioner gave his statements to police. Major Goods and Sergeant Lundy stated that the Petitioner and his father acknowledged that they could read the advice of rights form, and Major Goods said there was no evidence that the Petitioner or his father had any cognition issues. The proof overwhelmingly established that the Petitioner chose to give his second statement because his father asked him to provide it and not because of any coercion on the part of the police. Trial counsel testified that he made a calculated decision to have the Petitioner's statements speak for the Petitioner rather than to have the Petitioner testify at trial, where he would be cross-examined by experienced prosecutors from the gang unit. Trial counsel maintained that even if he had sought suppression of the Petitioner's statements, Kejuan Shields would have testified at trial that the Petitioner shot the victim and Perry's statement would have been admitted to show that the Petitioner was involved in the victim's death and was present at the crime scene. Because trial counsel made an informed, strategic decision to admit the Petitioner's statements to police in order for the jury to hear the Petitioner's story without subjecting him to cross-examination, this decision is entitled to deference on review. See House, 44 S.W.3d at 515; see also State v. Callahan, 979 S.W.2d 577, 582-83

(Tenn. 1998) (holding that juvenile waivers must be analyzed under a totality-of-the-circumstances test that requires consideration of juvenile's age, experience, education, and intelligence; the juvenile's capacity to understand the <u>Miranda</u> warnings and the consequences of the waiver; the juvenile's familiarity with <u>Miranda</u> warnings or the ability to read and write in the language used to give the warnings; any intoxication; any mental disease, disorder, or retardation; and the presence of a parent, guardian, or interested adult).

Moreover, the Petitioner failed to present a ground upon which a suppression motion could have been made. In order to prove prejudice on a claim that trial counsel was ineffective in failing to pursue a motion to suppress, the Petitioner must show by clear and convincing evidence that "(1) a motion to suppress would have been granted and (2) there was a reasonable probability that the proceedings would have concluded differently if counsel had performed as suggested." <u>Terrance Cecil v. State</u>, No. M2009-00671-CCA-R3-PC, 2011 WL 4012436 at *8 (Tenn. Crim. App. Sept. 12, 2011). Accordingly, "[i]t is a petitioner's burden to submit evidence (and not just his testimony surmising on the merits of a pre-trial suppression motion) that the suppression motion would have been granted and that there is a reasonable probability that the trial proceedings would have concluded differently if trial counsel had pursued a motion to suppress evidence." <u>Charles Bradford Stewart v. State</u>, No. M2015-02449-CCA-R3-PC, 2017 WL 2645651, at *14 (Tenn. Crim. App. June 20, 2017); <u>see</u> <u>Demarcus Sanders v. State</u>, No. W2012-01685-CCA-R3-PC, 2013 WL 6021415, at *4 (Tenn. Crim. App. Nov. 8, 2013). Here, the Petitioner failed to prove by clear and convincing evidence that a suppression motion would have been granted or that there was a reasonable probability that had a suppression motion been pursued, the outcome of his case would have been different, particularly in light of Shields' testimony and Perry's statement to police. Because the Petitioner has failed to prove that trial counsel's performance was deficient and prejudicial, he is not entitled to relief.

**III.** **<u>Constitutionality of the Petitioner's Life Sentence.</u>** Lastly, the Petitioner argues that his mandatory life sentence as a juvenile offender is unconstitutional because it is the "functional equivalent" of life without parole. He claims that cases outside this jurisdiction, which were decided after his conviction, impact the constitutionality of his sentence. The State counters that Tennessee courts have uniformly rejected the Petitioner's argument. We agree with the State and conclude that the Petitioner is not entitled to relief.

In Tennessee, a defendant convicted of first degree murder is subject to one of three possible sentences: (1) death; (2) life without the possibility of parole; and (3) life. Tenn. Code Ann. § 39-13-202(c). A defendant sentenced to life imprisonment in Tennessee may be released after service of at least fifty-one years if the defendant earns the maximum allowable sentence reduction credits. <u>Brown v. Jordan</u>, 563 S.W.3d 196, 202 (Tenn. 2018); <u>see</u> Tenn. Code Ann. § 40-35-501(h)(2).

In Miller v. Alabama, 567 U.S. 460, 479 (2012), the United States Supreme Court held that a mandatory sentence of life imprisonment without parole for juvenile offenders is unconstitutional in that it violates the Eighth Amendment's prohibition against cruel and unusual punishment. The Miller Court concluded that while it did not bar the imposition of a sentence of life without parole for juveniles convicted of murder, it did require that "a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing a particular penalty." Id. at 483. In Montgomery v. Louisiana, 136 S. Ct. 718, 736 (2016), the United States Supreme Court held that Miller announced a substantive rule of constitutional law that must be applied retroactively.

This court has repeatedly rejected the contention that a juvenile's mandatory life sentence, which requires service of fifty-one years before release, constitutes an effective sentence of life without parole in violation of Miller. See State v. Antonious Johnson, No. W2018-01125-CCA-R3-CD, 2019 WL 4008113, at *14-15 (Tenn. Crim. App. Aug. 23, 2019), perm. app. denied (Tenn. Dec. 9, 2019); State v. Walter Collins, No. W2016-01819-CCA-R3-CD, 2018 WL 1876333, at *19-21 (Tenn. Crim. App. Apr. 18, 2018), perm. app. denied (Tenn. Aug. 8, 2018); Martez D. Matthews v. State, No. M2015-02422-CCA-R3-PC, 2016 WL 7395674, at *4 (Tenn. Crim. App. Dec. 21, 2016), perm. app. denied (Tenn. Apr. 13, 2017); Charles Everett Lowe-Kelley v. State, No. M2015-00138-CCA-R3-PC, 2016 WL 742180, at *8 (Tenn. Crim. App. Feb. 24, 2016), perm. app. denied (Tenn. June 23, 2016); Billy L. Grooms v. State, No. E2014-01228-CCA-R3-HC, 2015 WL 1396474, at *4 (Tenn. Crim. App. Mar. 25, 2015), perm. app. denied (Tenn. July 21, 2015), cert. denied, 136 S. Ct. 1216 (Feb. 29, 2016); State v. Kayln Marie Polochak, No. M2013-02712-CCA-R3-CD, 2015 WL 226566, at *34 (Tenn. Crim. App. Jan. 16, 2015), perm. app. denied (Tenn. May 14, 2015); Cyntoia Denise Brown v. State, No. M2013-00825-CCA-R3-PC, 2014 WL 5780718, at *21 (Tenn. Crim. App. Nov. 6, 2014), perm. app. denied (Tenn. May 15, 2015); Floyd Lee Perry, Jr. v. State, No. W2013-00901-CCA-R3-PC, 2014 WL 1377579, at *5 (Tenn. Crim. App. Apr. 7, 2014), perm. app. denied (Tenn. Sept. 18, 2014); Charles Damien Darden v. State, No. M2013-01328-CCA-R3-PC, 2014 WL 992097, at *11 (Tenn. Crim. App. Mar. 13, 2014), perm. app. denied (Tenn. Sept. 18, 2014). However, as the concurring opinion in Zachary Everett Davis explained:

> [A]lthough Tennessee's sentencing scheme allows for possible release of a defendant convicted of first degree murder after the service of fifty-one years, it is only in the rare instance, if ever, that a juvenile so sentenced would be released back into society. Even if the judge or jury decides that the features of the juvenile or the circumstances of the homicide require a sentence other than life without parole, the effect of the sentence is still the same. The juvenile has no meaningful opportunity for release whether you name the sentence imprisonment for life or imprisonment for life without the

- 23 -

possibility of parole, and the juvenile will likely die in prison. "While the logical next step may be to extend protection to these types of sentences, this is not the precedent which now exists" in this State. [Floyd Lee] Perry, [Jr.], 2014 WL 1377579, at *4.

State v. Zachary Everett Davis, No. M2016-01579-CCA-R3-CD, 2017 WL 6329868, at *26 (Tenn. Crim. App. Dec. 11, 2017) (Thomas, J., concurring), perm. app. denied (Tenn. Mar. 14, 2018).

The Petitioner asserts that while previous arguments pursuant to Miller have been rejected, the Court of Criminal Appeals has begun to realize the "problematic nature of how Tennessee has been applying the law." See id. (Thomas, J., concurring) ("I am compelled to agree that our statutory sentencing scheme for first degree murder does not violate the strict holdings of those cases. However, it is my fear that the reality of our sentencing provisions, when applied to juveniles, may run afoul the spirit of those opinions."); State v. Martiness Henderson, No. W2016-00911-CCA-R3-CD, 2018 WL 1100972, at *7 (Tenn. Crim. App. Feb. 26, 2018) ("Despite our concerns about mandatory life sentences for juveniles in Tennessee, we feel bound by the precedent from this court on the subject."); Jacob Brown v. State, No. W2015-00887-CCA-R3-PC, 2016 WL 1562981, at *7 (Tenn. Crim. App. Apr. 15, 2016) ("[W]e cannot say that the petitioner's sentence of life without parole runs afoul of the rulings in Miller or Montgomery. That being said, we have misgivings about the consecutive nature of the petitioner's sentences in light of the Supreme Court's repeated emphasis that 'children are constitutionally different than adults,' [Montgomery, 136 S. Ct.] at 736, and its warnings against the imposition of excessive punishments against juvenile offenders."), perm. app. denied (Tenn. Aug. 19, 2016); Floyd Lee Perry, Jr., 2014 WL 1377579, at *5 ("The defendant received a sentence of life with the possibility of parole, albeit with consideration coming after fifty-one years. While the next logical step may be to extend protection to these types of sentences, that is not the precedent which now exists.").

The Petitioner also contends that other states have extended the holding in Miller in circumstances similar to those in his case. See Vasquez v. Commonwealth, 781 S.E.2d 920, 934 (Va. 2016) (Mims. J., concurring) ("The Court's holdings in Miller and Montgomery support the conclusion that any distinction between explicit and de facto life sentences without parole is one without a difference. . . . We cannot ignore the reality that a seventeen year-old sentenced to life without parole (Graham) and a sixteen year-old sentenced to a term of years beyond his lifetime (Vasquez) have effectively received the same sentence. Because both sentences deny the juvenile the chance to return to society, Graham applies to both sentences."); State v. Pearson, 836 N.W.2d 88, 96 (Iowa 2013) ("Though Miller involved sentences of life without parole for juvenile homicide offenders, its reasoning applies equally to Pearson's sentence of thirty-five years without the

possibility of parole for these offenses. . . . Therefore, we think a minimum of thirty-five years without the possibility of parole for the crimes involved in this case violates the core teachings of <u>Miller</u>."); <u>Funchess v. Price</u>, CV 14-2105, 2016 WL 756530, at *5 (E.D. La. Feb. 25, 2016) (order) ("Considering all of these obstacles, a life sentence under Louisiana's "two-step parole procedure" is—for all intents and purposes—a life sentence, regardless of whether the prisoner received a parole eligibility date."). The Petitioner argues that "it is clearly time for Tennessee to change how it applies the <u>Miller</u> decision to Tennessee sentencing as it pertains to juveniles."

We conclude that the Petitioner's cases from other jurisdictions are distinguishable and unpersuasive. The portion of <u>Vasquez</u> quoted by the Petitioner in his brief is actually from the concurring opinion. <u>Vasquez</u>, 781 S.E.2d at 934. The controlling opinion in <u>Vasquez</u> concluded that the <u>Graham v. Florida</u>, 560 U.S. 48 (2010), prohibition against life without parole sentences for juveniles not convicted of homicide, does not extend to non-life sentences that, when aggregated, exceed the normal life spans of juvenile offenders. <u>Vasquez</u>, 781 S.E.2d at 928. The controlling opinion then held that the aggregate sentences of 283 and 148 years imposed for numerous non-homicide crimes committed during a rape did not violate the Eighth Amendment. <u>Id.</u> Accordingly, <u>Vasquez</u> does not help the Petitioner. Although the Petitioner urges this court to employ a life-expectancy analysis when evaluating the constitutionality of all life sentences, such analysis has been rejected in the past. <u>See</u> <u>Harmelin v. Michigan</u>, 501 U.S. 957, 996 (1991) ("In some cases . . . there will be negligible difference between life without parole and other sentences of imprisonment—for example, a life sentence with eligibility for parole after 20 years, or even a lengthy term sentence without eligibility for parole, given to a 65-year-old man. But even where the difference is the greatest, it cannot be compared with death. We have drawn the line of required individualized sentencing at capital cases, and see no basis for extending it further."); <u>United States v. Beverly</u>, 369 F.3d 516, 537 (6th Cir. 2004) ("The Supreme Court has never held that a sentence to a specific term of years, even if it might turn out to be more than the reasonable life expectancy of the defendant, constitutes cruel and unusual punishment.").

The <u>Pearson</u> case is also distinguishable from the Petitioner's case. In <u>Pearson</u>, the juvenile defendant was convicted of two counts of first-degree robbery and two counts of first-degree burglary and received a fifty-year sentence wherein she was ineligible for parole until she served thirty-five years. <u>Pearson</u>, 836 N.W.2d at 89. The court, relying on <u>Miller</u>, as well as a provision of the Iowa Constitution and an Iowa Supreme Court case, vacated the defendant's sentence and remanded the case to the district court for further proceedings after holding that "an individualized sentencing hearing" is required when a juveniles offender receives a minimum of thirty-five years imprisonment without the possibility of parole for the offenses in this case. <u>Id.</u> at 95-98. In reaching this decision, the court stated, "[I]t should be relatively rare or uncommon that a juvenile be sentenced

- 25 -

to a lengthy prison term without the possibility of parole for offenses like those involved in this case." Id. at 96. The conviction offenses in Pearson, along with the court's reliance on the Iowa Constitution and an Iowa Supreme Court case, make it clearly distinguishable from the Petitioner's case.

Lastly, the Funchess case is unpersuasive. In Funchess, a district judge held that Louisiana's two-step parole procedure, which required those serving life sentences to first obtain a commutation by which the term of life is reduced to a fixed number of years by petitioning the governor for clemency through the Board of Pardons before becoming eligible for parole consideration, violated Miller when it was applied to juveniles and that the Petitioner's sentence of life in prison without eligibility for parole for a period of forty years was unconstitutional, regardless of whether the Petitioner's record indicated he was "eligible" for parole. Funchess, 2016 WL 756530, at *4-5. Louisiana's unique parole procedure clearly distinguishes Funchess from the Petitioner's case.

The record in this case shows that the Petitioner received a life sentence, not a mandatory sentence of life without parole. Although this sentence may exceed the Petitioner's life expectancy, we are bound by precedent on this issue. Because the post-conviction court properly denied relief on this ground, the Petitioner is not entitled to relief.

## **CONCLUSION**

The judgment of the post-conviction court is affirmed.

_____
CAMILLE R. MCMULLEN, JUDGE